UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SECURITIES INVESTOR PROTECTION          :
CORPORATION,                            :
                                        :
        Plaintiff,                      :
                                        :        12 MC 115 (JSR)
            -v-                         :
                                        :        OPINION AND ORDER
BERNARD L. MADOFF INVESTMENT            :
SECURITIES LLC,                         :
                                        :
        Defendant.                      :
------------------------------------x
In re:                                  :
                                        :
MADOFF SECURITIES                       :
------------------------------------x
PERTAINS TO:                            :
                                        :
Consolidated proceedings on             :
antecedent debt issues                  :
------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/15/13

JED S. RAKOFF, U.S.D.J.

    Under section 548(a)(1) of the Bankruptcy Code, the trustee of

a bankruptcy estate is empowered to, _inter alia_, "avoid any transfer

. . . of an interest of the debtor in property, or any obligation .

. . incurred by the debtor, that was made or incurred on or within 2

years before the date of the filing of the petition, if the debtor

voluntarily or involuntarily [] made such transfer or incurred such

obligation with actual intent to hinder, delay, or defraud any

entity to which the debtor was or became . . . indebted." 11 U.S.C.

§ 548(a)(1)(A).[1] However, this authority is limited by subsection (c)

---

[1] As detailed in the Court's April 2013 Opinion and Order, section
548(a)(1)(A) is the avoidance provision that is primarily applicable
to these proceedings because section 546(e) of the Bankruptcy Code

1

of the same section, which provides that "a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." Id. § 548(c). In other words, although a trustee in bankruptcy may avoid the entirety of an actually fraudulent transfer by the debtor, the transferee from whom that transfer is sought may retain the transfer "to the extent that [the transferee] gave value to the debtor" and acted in good faith. The question before the Court on the instant motion is whether and how this "value" limitation applies in the context of the avoidance and recovery actions brought by Irving Picard (the "Trustee"), the trustee appointed under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa et seq., to administer the estate of Bernard L. Madoff Investment Securities LLC ("Madoff Securities").[2]

The Court assumes familiarity with the underlying facts of Madoff Securities' fraud and ensuing bankruptcy and recounts here only those facts that are relevant to the instant issues. As

---

prevents the Trustee from seeking to avoid transfers from Madoff Securities under sections 544, 547, 548(a)(1)(B), and 548(b) of the Bankruptcy Code against the majority of adversary proceeding defendants. See 11 U.S.C. § 546(e); Opinion and Order, No. 12 MC 115, ECF No. 460 (S.D.N.Y. Apr. 15, 2013).

[2] The question of what constitutes a transferee's good faith in this context is the subject of a separate consolidated briefing and will be presumed for purposes of this Opinion.

explained in this Court's Opinion in Picard v. Greiff, 476 B.R. 715, 718 (S.D.N.Y. 2012), for many years Madoff Securities, a registered securities broker-dealer, operated a fraudulent investment advisory business, through which "Madoff Securities purported to make securities investments on [its] clients' behalf" and accordingly

> sent monthly or quarterly statements to each of its investment advisory clients showing the securities that Madoff Securities claimed to hold for the client and the trades that it claimed to have executed on the client's behalf during the applicable period. In reality, the investment advisory unit of Madoff Securities never, or almost never, made the trades or held the securities described in the statements it sent to investment advisory clients, at least during all years here relevant. Instead, Madoff Securities operated its investment advisory division as a Ponzi scheme. Thus, when clients withdrew money from their accounts with Madoff Securities, they did not actually receive returns on successful investments, but instead only the very money that they and others had deposited with Madoff Securities for the purpose of purchasing securities.

Id. (citations and footnotes omitted). Indeed, these payments were necessary to perpetuate Madoff Securities' fraud, as it was only by making such transfers that Bernard Madoff was able to induce new investors to continue to join his scheme. Id. at 723.

By the time that Madoff Securities was revealed to be a Ponzi scheme and entered into liquidation, some investors had withdrawn from their accounts more than they had initially invested (because of their erroneous assumption that the amounts reflected in their customer statements were in fact returns on their investment), while others had not withdrawn even the amounts they had invested. The defendants to the instant proceeding are Madoff Securities customers

3

who received in transfers from Madoff Securities more than they had invested and against whom the Trustee has brought avoidance and recovery proceedings to reclaim that difference. Defendants now move to dismiss the Trustee's complaints, arguing that they are entitled to retain the amounts transferred from Madoff Securities under section 548(c) because the transfers constituted "satisfaction ... of a[n] ... antecedent debt of the debtor," which is within the definition of "value" under section 548 of the Bankruptcy Code. 11 U.S.C. § 548(d)(2)(A).[3]

To understand the defendants' challenge to the Trustee's avoidance claims, a bit of statutory background is in order. As a general matter, a SIPA trustee is "vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under Title 11." 15 U.S.C. § 78fff-1(a). What makes a SIPA bankruptcy different from an ordinary bankruptcy is, in particular, that SIPA empowers a trustee to recover and distribute to the debtor

_____

[3] The defendants are able to bring this motion in this Court because they previously moved to withdraw the reference to the Bankruptcy Court, which the Court granted with respect to the following issues: "whether and to what extent (i) transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants at the time of the transfers; and (ii) obligations incurred by Madoff Securities may be avoided by the Trustee, including whether they were exchanged for value, such as antecedent debts owed to the Antecedent Debt Defendants." Order at 4, No. 12 MC 115, ECF No. 107 (S.D.N.Y. May 16, 2012). The Court received consolidated briefing on these issues from defendants, the Trustee, and the Securities Investor Protection Corporation ("SIPC"), and heard oral argument on August 20, 2012.

broker-dealer's customers "customer property," defined as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." 15 U.S.C. § 78lll(4). Correspondingly, SIPA superimposes on the Bankruptcy Code a separate customer property estate that takes priority over the debtor's general estate. Customer property remaining in the possession of the debtor at the time of filing for bankruptcy is allocated to this separate customer property estate for distribution according to SIPA's statutory priorities, under which customers of the debtor "share ratably in such customer property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff-2(c)(1).

To the extent that existing "customer property is not sufficient to pay in full" those statutorily identified claims, the trustee is empowered by SIPA to "recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11. Such recovered property shall be treated as customer property." 15 U.S.C. § 78fff-2(c)(3). If the recovered funds "are not sufficient to pay or otherwise satisfy in full the net equity claims of customers, such customers shall be entitled, to the extent only of their respective unsatisfied net equities, to participate in the general estate as unsecured

creditors." 15 U.S.C.A. § 78fff-2(c)(1). Conversely, if any customer

property remains "after allocation in accordance with" SIPA's

statutory priorities, those assets "become part of the general

estate of the debtor." Id.

Thus, in addition to the ordinary recovery of the debtor's

assets for distribution to creditors of the general estate, the

Trustee in this SIPA proceeding must both recover customer property

— which, for our purposes, has primarily been transferred to other

customers in the form of fictitious "profits" as part of Madoff

Securities' efforts to perpetuate its fraud — and then distributed

to customers who have "net equity" claims. See 15 U.S.C. § 78fff-

2(b) (requiring a SIPA trustee to "promptly discharge . . . all

obligations of the debtor to a customer relating to, or net equity

claims based upon, securities or cash . . . insofar as such

obligations are ascertainable from the books and records of the

debtor or are otherwise established to the satisfaction of the

trustee"). The Trustee has taken the position that, in this case, a

customer's net equity and the amounts sought in avoidance and

recovery proceedings (assuming the customer's good faith) are two

sides of the same coin. That is, a "customer's 'net equity' [is]

calculated by the 'Net Investment Method,' crediting the amount of

cash deposited by the customer into his or her [Madoff Securities]

account, less any amounts withdrawn from it," as opposed to "the

market value of the securities reflected on their last . . .

customer statements." In re Bernard L. Madoff Inv. Sec. LLC, 654

F.3d 229, 233 (2d Cir. 2011). A customer who withdrew less than she deposited over the course of her investment with Madoff Securities has a net-equity claim and may be entitled to disbursements from the customer property estate for the amount of that net equity. At the same time, the Trustee has engaged in the same "netting" process and has brought avoidance actions for the amount in excess of their deposits against those investors who withdrew more money from their accounts than they deposited, including each of the defendants party to this consolidated proceeding. These avoidance actions are limited by the two-year "reach-back period" specified in section 548(a)(1) for fraudulent-transfer actions. See 11 U.S.C. § 548(a)(1).

In Greiff, this Court rejected the argument that Madoff Securities' payments of fictitious profits to its customers discharged the debtor's obligation to pay the amounts reflected on the defendants' most recent customer statements, making the entirety of Madoff Securities' transfers to its customers repayment of an antecedent debt and therefore "for value." See Greiff, 476 B.R. at 724-25. As the Court stated, "[I]n this context, the transfers must be assessed on the basis of what they really were; and they really were artificial transfers designed to further the fraud, rather than any true return on investments." Id. at 725. Thus, the Court held that any "transfers from Madoff Securities to defendants that

exceeded the return of defendants' principal . . . were not 'for value'" for purposes of section 548(c).[4] Id.

In the instant action, defendants argue that Greiff's holding that "value" under 548(c) is restricted to principal invested is too limited an understanding of that term. Defendants claim that the federal and state law claims that they assert they hold against Madoff Securities constitute "antecedent debts," as the Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(12).

_____

[4] In their consolidated briefing, defendants once again argue that they have valid contract claims under state law against Madoff Securities for amounts reported in their customer brokerage statements. For the reasons stated in Greiff, those arguments are rejected once again. See 476 B.R. at 724-25; see also In re Hedged-Inv. Assocs., Inc., 84 F.3d 1286, 1290 (10th Cir. 1996) ("Ms. Buchanan did not have the enforceable option of affirming her contract with HIA Inc. and recovering expectation and consequential damages. Because she had no claim against HIA Inc. for damages in excess of her original investment, HIA Inc. had no debt to her for those amounts. Therefore, the transfers could not have satisfied an antecedent debt of HIA Inc., which means HIA Inc. received no value in exchange for the transfers."). Similarly, the Court rejects defendants' contention that Madoff Securities' pre-reach-back-period account statements constitute binding obligations of Madoff Securities to its customers that the Trustee must avoid. This argument was effectively rejected in Greiff, where the Court found that the account statements were not merely avoidable but were in fact invalid and thus entirely unenforceable. See 476 B.R. at 726 ("Any entitlement defendants had to a return on their investment, then, depended on a representation that Madoff Securities had in fact generated a profit. The complaints allege that Madoff Securities' representations in this regard were wholly fraudulent. Thus, defendants, in effect, ask the Court to enforce the fraud on the ground that the vehicle of this particular Ponzi scheme, in contrast to others, styled itself as a stockbroker. Such a distinction pays only lip service to the underlying realities of the Ponzi scheme, and the Court rejects it."). Additionally, even if defendants held legitimate discretionary brokerage accounts with Madoff Securities, they would have been entitled only to the securities in their accounts on the date of demand, and therefore older statements would have been unenforceable in any case.

"Claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A); see also Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 549 U.S. 443, 451 (2007) ("When the Bankruptcy Code uses the word 'claim' — which the Code itself defines as a 'right to payment,' 11 U.S.C. § 101(5)(A) — it is usually referring to a right to payment recognized under state law."). Since satisfaction of an antecedent debt constitutes "value," 11 U.S.C. § 548(d)(2)(A), defendants argue that they are entitled to retain transfers in excess of their initial investments under section 548(c) to the extent that those transfers compensate them for state and federal claims that they hold against Madoff Securities.

It is true that, in non-SIPA cases involving Ponzi schemes, payments in satisfaction of claims have been recognized as providing value to the estate. In these cases, the theory of why Ponzi scheme investors are entitled even to their initial amounts of principal — where, that is, investors were not contractually guaranteed a certain rate of return — derives from a theory of restitution. As described in another case in this District, defendants "gave value in the form of their initial investments, and have tort claims of rescission to recover all of their initial investment based on fraudulent inducement." In re Bayou Grp., LLC ("Bayou IV"), 439 B.R. 284, 309 (S.D.N.Y. 2010); see also Donell v. Kowell, 533 F.3d 762,

772 (9th Cir. 2008) ("Payments up to the amount of the initial investment are considered to be exchanged for 'reasonably equivalent value,' and thus not fraudulent, because they proportionally reduce the investors' rights to restitution.").

However, in such circumstances, even where courts have recognized claims against the bankruptcy estate to the extent of principal invested, they have nonetheless rejected claims for interest in excess of principal, which defendants to this proceeding seek to claim.[5] This is because it is a generally recognized principle that, where defendants seek rescission and have received full repayment on the principal invested, they have no freestanding interest claim. See Bayou IV, 439 B.R. at 337 ("The pre-judgment interest remedy does not provide an independent cause of action that accrues to Appellants' benefit at the moment of redemption."). Rather, prejudgment interest "is a make-whole remedy ordered by the Court once a final judgment for a sum certain is entered, see N.Y. C.P.L.R. § 5001." Id.

Even if this were a non-SIPA Ponzi scheme case, no such judgment has been entered here. "Moreover, [defendants] collected the debt owed them — their initial investment — and thus there is no sum upon which pre-judgment interest could attach." Id. Thus, even

---

[5] To the extent that defendants' argument for interest on their state and federal claims can be construed as an argument that their net-equity claims should be adjusted based on the time value of money, the Court will not address it, as it did not withdraw the reference with respect to that question. See Greiff, 476 B.R. at 727 n.10.

if the Court were to accept that defendants' state and federal law claims could constitute antecedent debts, their claims to interest would not be such.[6]

The more fundamental problem defendants face is that the cases recognizing payments on claims against the estate as providing value were not SIPA proceedings. Indeed, in a SIPA bankruptcy even the claim for return of principal is based, not on a claim for restitution (let alone fraud and breach of fiduciary duty), but on a claim that depends on the notion of net equity.

As discussed above, SIPA creates a separate, priority customer property estate and provides for the recovery of customer property to be distributed according to each customer's net-equity claim. As this Court stated in Greiff,

> To allow defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims. Indeed, . . . courts typically find that satisfaction of antecedent debt provides value to the debtor because the fraudulent transfer provisions do not try "to choose among" a debtor's creditors. SIPA, however, prioritizes net equity claims over general creditor claims. Moreover, SIPA specifically connects

---

[6] Defendants also argue that, rescission aside, they can assert claims against Madoff Securities for violations of Rule 10b-5, 17 C.F.R. § 240.10b-5, violations of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), and the right to void their investment contracts under § 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b), as well as New York state claims for fraud and breach of fiduciary duty. Because the Court finds that such claims cannot provide value as against the Madoff Securities customer property estate under SIPA, it does not reach whether defendants have a claim for damages under such theories or ancillary issues such as whether the statute of limitations has run on these claims.

> its priority system to its incorporation of the
> fraudulent transfer provisions, empowering a trustee to
> invoke those provisions "[w]henever customer property is
> not sufficient to pay in full" the priority claims. 15
> U.S.C. § 78fff-2(c)(3). A presumption that the
> fraudulent transfer provisions do not choose between
> creditors should not and logically cannot apply to
> frustrate the Trustee's efforts to satisfy priority
> claims.

476 B.R. at 727-28. The Court adheres to that view not just with

respect to the Greiff defendants' claims to profits they received,

but also with respect to the consolidated defendants' assertion of

state and federal law claims against the Madoff Securities estate.

Defendants claim that the Trustee is seeking greater power than

that provided a trustee under the Bankruptcy Code, which they assert

is impermissible because SIPA does not redefine "value," and because

it provides a trustee only with the same authority to avoid

fraudulent transfers as an ordinary bankruptcy trustee. However,

while SIPA provides that a SIPA trustee is "vested with the same

powers and title with respect to the debtor and the property of the

debtor, including the same rights to avoid preferences, as a trustee

in a case under Title 11," 15 U.S.C. § 78fff-1(a), it also provides

that the provisions of the Bankruptcy Code apply only "[t]o the

extent consistent with the provisions of this chapter," 15 U.S.C. §

78fff(b). Thus, although the Trustee has the same authority to avoid

transfers as a bankruptcy trustee, those powers must be interpreted

through the lens of SIPA's statutory scheme. Indeed, this was one of

the reasons the Court withdrew the reference in these cases, since

SIPA involves features of both bankruptcy law and securities law.

Furthermore, section 78fff-2(c)(3) allows the Trustee to avoid transfers of customer property "if and to the extent that such transfer is voidable or void under the provisions of Title 11." 15 U.S.C. § 78fff-2(c)(3). Although defendants insist that section 548(c) is a limitation on the Trustee's avoidance powers, such a characterization conflates two separate concepts. Section 548(a)(1) empowers a trustee to avoid the entirety of a fraudulent transfer, while section 548(c) provides an affirmative defense that allows a defendant to retain portions of that otherwise entirely avoidable transfer. See In re Bayou Grp., LLC ("Bayou II"), 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007) (Section 548(a)(1)(A) "avoids the *entire* amount of 'any transfer' which was made by the transferor with actual intent to hinder, delay or defraud creditors. Moreover, the entirety of the transfer is avoidable whether or not the debtor received value in exchange . . . ."). Thus, to the extent that SIPA limits the Trustee's avoidance powers to those transfers that are "void or voidable" under the Bankruptcy Code, that provision merely gives the Trustee the authority to rely on section 548(a)(1)(A). It does not necessarily imply that section 548(c)'s affirmative defense must apply in the same way to the customer property estate as it would to the general estate.

More fundamentally, the definition of net equity and the definition of claims that can provide "value" to the customer property estate are inherently intertwined where the customer property estate is created as a priority estate intended to

compensate customers only for their net-equity claims. Net equity is defined for purposes of the Madoff Securities proceeding as the difference between a customer's investments of principal and withdrawals. See In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 233. To the extent that defendants' state and federal law claims allow them to withhold funds beyond their net-equity share of customer property, those defendants are, in effect, making those damages claims against the customer property estate. Because their damages claims are not net-equity claims (or any other payments that are permitted to be made in SIPA's priority scheme), allowing such claims to be drawn out of the customer property estate would violate SIPA. It is for this reason that only a defendant's investment of principal may count as "value" with respect to the customer property estate for purposes of section 548(c). See Greiff, 476 B.R. at 728 ("[W]hen determining whether a transferee provides value, SIPA requires consideration not only of whether the transfer diminishes the resources available for creditors generally, but also whether it depletes the resources available for the satisfaction of customers' net equity claims and other priority claims.").

The structure of SIPA supports this reading. First, SIPA allows claims against the customer property estate only to the extent they are ascertainable from the debtor's books and records, see 15 U.S.C. § 78fff-2(b), a requirement defendants' damages claims do not and cannot meet, as each defendant's lost opportunity costs and out-of-pocket expenses would not be reflected in Madoff Securities'

14

records. Second, SIPA provides that, to the extent that customer property is insufficient to meet all net-equity claims, customers may assert claims against the general estate "only to the extent" of those net-equity claims, see 15 U.S.C. § 78fff-2(c)(1)(d), indicating that these are the only claims allowed against the customer property estate. Thus, SIPA makes clear that net-equity claims for customer property come first out of this separate estate; to the extent that payment of defendants' state and federal law claims would discharge an antecedent debt, that debt runs against Madoff Securities' general estate, not the customer property estate, and therefore cannot be the basis of the retention of customer property under section 548(c).

Defendants argue that SIPA incorporates the provisions of the Securities Exchange Act of 1934, of which it is a part, including section 28(a)(2), which explicitly preserves "any and all other rights and remedies that may exist at law and equity." 15 U.S.C. § 78bb(a)(2). However, the fact that defendants' state and federal law claims cannot provide value against the separate customer property estate does not mean that those claims are not preserved. Here, it is crucial that the customer property estate is a separate and distinct estate from the general bankruptcy estate, not merely a set of priorities. While defendants may generally be correct that payment of even a non-priority claim is sufficient to provide value for purposes of section 548(c) in an ordinary bankruptcy, the distinction here — an entirely separate estate for a particular kind

of claim — goes beyond what priority a creditor has. Thus, nothing the Court has stated herein deprives a defendant of the ability to make a claim against Madoff Securities' general estate; rather, the Court finds merely that a defendant cannot assert such a claim as value against the customer property estate. See Rosenman Family, LLC v. Picard, 395 F. App'x 766, 768 (2d Cir. 2010) ("Generally, SIPA liquidations involve two kinds of claimants: customers and general unsecured creditors. To protect customers of failed brokerages, their claims are satisfied from a customer property estate, which is separate from the general estate used to satisfy the claims of general unsecured creditors." (footnote omitted)); Cf. In re Klein, Maus & Shire, Inc., 301 B.R. 408, 421 (Bankr. S.D.N.Y. 2003) (finding that claims "for damages resulting from a broker's misrepresentations, fraud or breach of contract are not protected" as customer claims because such claims make the claimants only "general creditors"). While this may deprive the claims of "value" in a more practical sense (given the likelihood that there will be nothing left for the Madoff Securities general estate), it does not mean that the claims may therefore run against the customer property estate in violation of the statutory distribution scheme set out in SIPA. See 15 U.S.C. § 78fff-2(c)(1) (setting out four categories of payments to be made out of customer property and providing that "[a]ny customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor"); see also Greiff, 476 B.R. at 728 ("[A] different approach

16

would ignore both SIPA's distinctions between creditors and its specific concern for the depletion of the fund of 'customer property' available for distribution according to customers' 'net equities.' Neither bankruptcy law nor state law require[s] the Court to disregard SIPA in this fashion.").

Finally, this outcome is a logical application of the policy motivating SIPA. In a SIPA bankruptcy, it is often the case that the universe of funds available consists primarily of customer investments of principal, which, at the point of entering into bankruptcy, are no longer sufficient to reimburse all customers. In these situations, it is also likely that each and every customer has a claim against the debtor for fraud, breach of fiduciary duty, or the like. SIPA makes the policy decision that the best way to proceed in these circumstances is to attempt to treat each investor equitably by providing for recovery of customer property and pro rata distributions based on each customer's net-equity claim, rather than merely letting those who came out ahead to retain the amounts obtained. Cf. Donell, 533 F.3d at 776 ("[C]ourts have long held that is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell."). While courts have recognized this principal in the context of any fraud, it is all the more true in a SIPA bankruptcy, where it would significantly undo the SIPA scheme to allow customers to recast amounts received as something other than what they were —

17

fictitious profits — and treat them as a claim for antecedent debts beyond the customer's net equity. Under this view, to effectuate SIPA's mandate, a customer may only seek the protections of section 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate.

Defendants next argue that they are entitled to a "credit" for all new amounts deposited with Madoff Securities during the reach-back period, to be applied against potentially avoidable withdrawals.[7] The defendants' approach, which they deem the "Replenishment Credit Method," stands in contrast to the Trustee's approach, which endorses the Net Investment Method for both the calculation of net equity and the recovery of fraudulent transfers; i.e., the Trustee would net out all deposits and withdrawals over the life of an account and treat as recoverable fraudulent transfers any withdrawals during the two-year reach-back period over and above principal invested at any time.

In Greiff, the Court stated that the proper method to calculate how much the Trustee may recover is as follows:

> [T]he Court adopts the two-step approach set forth
> in Donell v. Kowell, 533 F.3d 762, 771-72 (9th Cir.
> 2008). First, amounts transferred by Madoff Securities

---

[7] The Trustee argues that the Court has already addressed these issues in its prior decisions by rejecting defendants' arguments in favor of a "reset to zero" approach that would have the same effect as the defendants' "Replenishment Credit Method" approach advocated here. Although the Trustee may be correct, the Court addresses its reasoning here for clarity's sake as it applies its decision to all cases in this consolidated proceeding.

> to a given defendant at any time are netted against the
> amounts invested by that defendant in Madoff Securities
> at any time. Second, if the amount transferred to the
> defendant exceeds the amount invested, the Trustee may
> recover these net profits from that defendant to the
> extent that such monies were transferred to that
> defendant in the two years prior to Madoff Securities'
> filing for bankruptcy. Any net profits in excess of the
> amount transferred during the two-year period are
> protected from recovery by the Bankruptcy Code's statute
> of limitations. See 11 U.S.C. § 548(a)(1).

476 B.R. at 729. Greiff appears to adopt the Trustee's

straightforward netting approach, as have a number of other courts

that have dealt with this issue. See, e.g., In re Hedged-Inv.

Assocs., 84 F.3d 1286, 1288–90 (10th Cir. 1996) (calculating, for

purposes of section 548(c), the amount received over principal

invested over the course of the investment relationship).

    While the defendants seem to accept this approach for the

majority of cases, they argue that it reaches an unfair outcome for

the class of defendants who had negative balances at the beginning

of the reach-back period and who subsequently made deposits into

their Madoff Securities accounts. An example best illustrates the

situation in which these two approaches lead to different

conclusions. Assume a customer deposited $200,000 and withdrew

$500,000 prior to the reach-back period, for a withdrawal above

principal of $300,000. If, during the reach-back period, the

customer were then to withdraw $150,000 and deposit $200,000, the

customer would be liable for $150,000 under the Net Investment

Method: he invested $400,000 and withdrew $650,000, totaling

$250,000 in excess withdrawals, of which $150,000 was withdrawn in the reach-back period. However, under the Replenishment Credit Method, he would be liable for nothing, as he invested more than he withdrew in the reach-back period. For the reasons that follow, the Court finds that the Net Investment Method is the more appropriate approach.

Defendants argue that the Replenishment Credit Method must be applied because the Net Investment Method improperly permits the Trustee to circumvent the limitation of the statutory reach-back period to indirectly avoid and recover time-barred withdrawals by applying deposits during the reach-back period against old withdrawals, rather than against new withdrawals made during the reach-back period. This is a mischaracterization of what is occurring under the Net Investment Method. It is true that section 548(a)(1) allows the Trustee to avoid only those transfers made by the debtor "on or within 2 years before the date of the filing of the [bankruptcy] petition." 11 U.S.C. § 548(a)(1)(A). Yet there is no similar limitation in section 548(c) with respect to whether a given transfer is "for value." The concept of harm or benefit to the estate is separate from the concept of the reach-back period, which merely serves to allow finality to ancient transactions. See In re N. Merch., Inc., 371 F.3d 1056, 1059 (9th Cir. 2004) ("[T]he primary focus of Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the unsecured creditors."). Thus, there is no reason why a line should be drawn at

the beginning of the reach-back period in determining whether a transfer was for value.

In the example above, the Trustee may properly net the $200,000 reach-back period deposit against the pre-reach-back period $300,000 negative balance, as the customer had already received the "value" he is entitled to in relation to that $200,000 deposit. Although the defendants argue that the estate is "enriched" to the extent of the customer's $200,000 deposit during the reach-back period, this contention is based on the faulty assumption that the value of the customer property estate is somehow set in stone at the beginning of the two-year reach-back period, such that any investment of principal enriches the estate. Just as defendants are entitled to net-equity claims for amounts of principal invested before the reach-back period that they never withdrew, so too must withdrawals before the reach-back period be considered to determine whether a given transfer in fact compensated a given defendant for a claim it would otherwise have had. Thus, it makes little sense to draw a boundary at the beginning of the reach-back period for purposes of recovery, but not for purposes of net-equity claims.[8] See Donell, 533 F.3d at 773-74 (rejecting the argument that "if some of the transfers from within the statutory period were returns of the principal which Kowell invested *before* the statutory period, these

---

[8] To the extent that defendants assert that the Net Investment Method allows the Trustee to obtain a "double recovery" of transfers, that is only a concern so long as one accepts the premise that the estate is fixed as of the beginning of the reach-back period, which the Court does not.

transfers would also fall outside of the statute of limitations"
because such a "tracing requirement is unsupported by law and would
be unmanageable in practice").

Although defendants seek support in case law suggesting that a
trustee may not recover fraudulent transfers where the funds
transferred were repaid to the debtor in whole or in part, see,
e.g., In re Lease-A-Fleet, Inc., 155 B.R. 666, 682 (Bankr. E.D. Pa.
1993) (dismissing fraudulent-transfer claims where "circles of cash"
came back to the debtor), the analogy they seek to draw is inapt.
The Net Investment Method seeks to achieve this same end, but does
so more equitably than the Replenishment Credit Method: Under the
Net Investment Method, defendants receive credit to the extent that
they provided value to Madoff Securities over the life of their
investment relationship, whereas the Replenishment Credit Method
shifts the point at which principal turns into fictitious profits
for some defendants, granting them a windfall based on the
happenstance of the timing of those investments of principal. Thus,
any amounts effectively returned to the debtor at any point are
netted against that defendant's withdrawals. Furthermore, while
under the defendants' approach the Net Investment Method would be
applied to all other defendants, application of the Replenishment
Credit Method would benefit only those who continued to invest new
amounts of principal with Madoff during the two-year reach-back
period, allowing them to reduce the pool of funds available for
distribution to customers with net-equity claims, at the expense of

those other customers. Defendants offer no compelling reason why that policy choice is the correct one.

Instead, SIPA mandates the equitable treatment of all customers, which the Net Investment Method supports, as SIPA prioritizes the pro rata distribution of "customer property on the basis and to the extent of their respective net equities." 15 U.S.C. § 78fff-2(b); see also Greiff, 476 B.R. at 727 ("SIPA specifically connects its priority system to its incorporation of the fraudulent transfer provisions . . . ."). Indeed, this approach harmonizes the avoidance and recovery scheme with the Second Circuit's decision upholding the Trustee's net-equity calculation, even if the issue of the scope of the Trustee's avoidance power was not explicitly before the Second Circuit in that case. See In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d at 242 n.10 ("[I]n the context of this Ponzi scheme[, ]the Net Investment Method is nonetheless more harmonious with provisions of the Bankruptcy Code that allow a trustee to avoid transfers made with the intent to defraud, and avoids placing some claims unfairly ahead of others." (internal quotation marks, brackets, and citations omitted)). For all of these reasons, the Court finds that the Net Investment Method is the better approach, and defendants should not be specially credited for investments occurring during the reach-back period.

Finally, defendants contend that inter-account transfers occurring between customers before the reach-back period should be treated as principal and therefore should constitute "value" for

purposes of section 548(c). Under the Trustee's proposed treatment of these transfers, inter-account transfers in excess of principal deposited in the sender's account are treated as fictitious profits, not principal, in the recipient's account. Defendants argue that an inter-account transfer of profits made before the reach-back period should receive the same treatment as would occur if the sender withdrew the profits prior to the reach-back period and gave the funds to the recipient, who then chose to invest those funds in his or her own account. In this hypothetical scenario, the sender's withdrawal would not be subject to avoidance because it occurred before the reach-back period, and the recipient's investment would be treated as principal in the recipient's account (and thus would be credited against any withdrawals). Thus, according to defendants, the Trustee's method provides disparate treatment to economically equivalent transactions and thus is unfair.

Although defendants contend that the Trustee's method elevates form over substance, the true substance of transfers of fictitious profits from one account to another remains the same: The funds at issue are still other people's money, and shifting them among accounts, whether those accounts are owned by the same person or entity or, for example, transfers among family members, does not morph those funds into actual new principal. See In re PCH Assocs., 949 F.2d 585, 597 (2d Cir. 1991) ("[A court] may look through form to substance when determining the true nature of a transaction as it relates to the rights of parties against a bankrupt's estate."). In

24

other words, no new value was created by moving these funds between different accounts. This is the result reached by another court in this District in an analogous Ponzi scheme case, In re Bayou Group, LLC, in which the defendants sought to have their fraudulent-conveyance liability calculated not on the basis of their original principal investments but rather on the basis of the amount they rolled over into new accounts when the original Bayou Fund split into four successor funds not long before entering into bankruptcy. See Bayou IV, 439 B.R., 284, 338 (S.D.N.Y. 2010). The bankruptcy court dismissed that suggestion, stating that "in no event is it appropriate to pile fiction on fiction by deeming these investors' final Bayou Fund account statements, including fictitious profits, to be the value of their investments contributed to the Bayou hedge funds," In re Bayou Grp., LLC ("Bayou III"), 396 B.R. 810, 884-85 (Bankr. S.D.N.Y. 2008), and the district court upheld that decision on appeal, Bayou IV, 439 B.R. at 338-39. Despite the factual distinction between a single individual's accounts in Bayou and a transfer among accountholders here, the Bayou court's reasoning nonetheless applies and is persuasive on the facts of this case.

To the extent that defendants argue that a failure to treat these pre-reach-back-period transfer amounts as principal allows the Trustee to indirectly avoid transfers that would otherwise be too old to be avoided, that argument is rejected for the reasons discussed above. That is, because there is no time limit on what constitutes "value" for purposes of section 546(c), an inter-account

25

transfer of fictitious profits does not become principal (and thus repayment of an antecedent debt owed by Madoff Securities) just because it occurred prior to the reach-back period. To the extent that no actual principal was transferred, the inter-account transfer could provide no value to Madoff Securities.

Similarly, although defendants claim that such a transfer may be viewed as a transfer of the right to receive an unavoidable payment from Madoff Securities, that right does not exist as long as the fictitious profits remained with Madoff Securities, and so the sender had no such right to transfer. To the extent that this distinction appears arbitrary, that is unavoidable. In a long-running fraud such as this one, the two-year cut-off for the reach-back period "arbitrarily" allows a Madoff Securities investor who withdrew all of his funds in November 2006 to keep the entirety of his "profits," while a similarly situated investor who withdrew those funds only a month later would not have the same right. The Court likewise must either treat a pre-reach-back-period transfer of fictitious profits as what it is — a transfer of funds that never belonged to the sender or recipient — or as a hypothetical withdrawal and investment that never occurred. The Court chooses the option that most reflects the reality of these transfers and that treats all investors as equitably as possible.

Finally, contrary to the defendants' assertion, it is irrelevant that certain of these pre-reach-back-period transfers established new accounts and therefore new customer–broker

relationships. The establishment of such new relationships would at best provide a basis for these defendants to bring the same state and federal law claims that this Court has herein rejected as a basis of "value" against the customer property estate for purposes of section 548(c). At heart, the substance of these transactions was merely to perpetuate a cycle of artificial profits and further investments; where there was no investment of new principal, even those pre-reach-back-period transfers establishing new accounts failed to provide any new value. See Bayou IV, 439 B.R. at 338-39 ("Cases holding that an exchange of stock constitutes a new investment under securities and tax law . . . are not persuasive here, where the purported value of the exchange was itself fictional and fraudulent.").

In summary, the Court concludes that claims against the general Madoff Securities estate do not constitute "value" within the meaning of section 548(c) to the extent that they would be used to withhold fraudulent transfers owing to the customer property estate under SIPA. Furthermore, the Court finds that a straight netting method — subtracting total withdrawals from total deposits of principal — is the appropriate way to calculate not only net equity but also a defendant's fraudulent-transfer liability; that is, the Court rejects defendants' assertion that deposits of principal in the reach-back period should be netted against withdrawals in the same period in calculating their fraudulent-transfer liability. Finally, the Court finds that pre-reach-back-period inter-account

transfers of amounts exceeding principal in the account of the sender continue to be fictitious profits, not principal, in the account of the recipient, and therefore do not constitute antecedent debt for the recipient of the funds.

Accordingly, defendants' motion to dismiss on all of the above grounds is denied. Except to the extent provided in other orders, the Court directs that the following adversary proceedings be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order: (1) those cases listed in Exhibit A of item number 107 on the docket of 12 Misc. 115; and (2) those cases listed in the schedule attached to item number 468 on the docket of 12 Misc. 115 that were designated as having been added to the "antecedent debt" consolidated briefing.

SO ORDERED.

Dated: New York, NY
October 15, 2013

JED S. RAKOFF, U.S.D.J.